The next case for argument is 24-1142, Midwest-CBK v. United States. Mr. Kline, don't feel bad that you cleaned out the room. I'm sorry, Your Honor. Don't feel bad that you cleaned out the room. It's all in feedback. May it please the Court. Thank you, Your Honors. It is my first appellate argument, so maybe it's better if it's empty. It's all recorded for posterity, so thank you. My name is Patrick Kline. I'm an attorney at Neville Peterson, joined by my colleague, Mr. John Peterson, and we're arguing today on behalf of Appellant Midwest-CBK. There are two issues before the Court in this appeal. The first is whether the trade court properly held that appellant's injuries were not deemed liquidated by operation of law and whether the trade court properly held that the appellant's sales to customers were sales for export to the U.S. and could serve as the basis of transaction value. I would like to start with the deemed liquidation arguments and finish with the sales for export issue. The protested entries were deemed liquidated by the operation of law according to 19 U.S.C. 1504. According to the statute, customs may extend liquidation of an entry if the information needed for proper appraisement is not available to the customs service. Under the language of the statute, it is clear that CBP has authority to extend liquidation when the agency does not have possession of the necessary info to appraise the entry. By June 2014, the latest, all of the information necessary for the liquidation had been given to the agency in this case. Yeah, but the foreign, I mean, my instincts may be different, but our precedent says that you can, it's not just getting information from outside parties. It can be information from inside the agency as well. So that ship has sailed, not understanding what the language says. What we're arguing is not that there was necessary information outstanding that customs needed to appraise the entries. What customs was doing was an internal bureaucratic analysis of the information and that that took too long to happen and that the information necessary for the appraisement was in their possession when Midwest answered all their needs. The analysis that they were doing, doesn't that go to the appraisement? The analysis they were doing, it did deal with what was the proper appraisement, but if you look at the steps that they took, right, it was let's make sure that someone checked off on it, someone supervised it, that there was a quality assurance check and stuff like that. I mean, but there were checks happening, there were a lot of checks, but they were happening on a fairly regular basis during this entire time period, weren't they? Yes, the detail was happening at a regular basis, but again, as we say, those checks are not the information that was required to appraise these entries. That information was what Midwest submitted to them. Their analysis isn't that information. During that time period, CBP conducted the painstakingly so analysis. The draft audit report that they issued was only a page and a half long, and after they issued the draft audit report, the agency went silent again for an additional seven months until it released the final audit report in 2016, and then it began liquidating entries in April of that year. Did Midwest ever provide some type of documents or evidence that customs had not followed the customary practice in extending the liquidation of entries after that period in June 2014? I'm sorry, Your Honor, I'm not sure I understood your question. It sounds like you're arguing, and you can correct me if I misunderstood your argument, but it sounds like you're arguing that they failed to follow the customary practice or they took too long in terms of your conversation you had back and forth with Judge Andrews. What I'm wondering is did you provide anything to customs to say, hey, you're not doing this right. You're not following what should be customary practice or your timing or anything like that. There was nothing specific submitted that said that I think the clock is running on the liquidations. What we're not arguing is that there was a customary practice or something like that. We're just arguing based on the plain statutory text about information being needed by the agency. So you think the CIT judge, who did a very thorough job, says because customs had a reasonable basis for extending liquidation in order to complete the audit process, ensure its accuracy, and comply with established standards. Did you put on evidence that dislodges those conclusions in any way, shape, or form? I don't think the evidence is submitted in itself about what CVP was doing during this time. Not that they were moving quickly to liquidate the entries and to come up with their final determination. It's that they took forever. I think that this case is- Answer her direct question. She asked you a question that's really a yes or no question. Did you provide evidence in any shape or form with respect to that? No. No, Your Honors. So how do we overturn these findings if you're not disputing those findings, or you're recognizing that there's nothing in the record that would refute those conclusions? So are you saying as a matter of law that's not what you should look for? Yes, Your Honors. We're saying as a matter of law that when CVP gets put on the clock by the liquidation statute, that the amount of time that their bureaucratic processes take is not providing them with the necessary info to liquidate the entry. If I can draw a comparison to the Ford Motor case, in that case the court held that despite CVP reportedly investigating the importer for fraud, the record could reasonably reflect that the agency did nothing for close to two years while extending the liquidations. Yeah, but they didn't do nothing. I mean, there's no finding here that they did nothing for two years. The finding is that they did this audit thing and all this stuff during the period in question. Yes. We're arguing that CVP's internal deliberations were not the proper steps that needed to be taken to define the necessary facts to liquidate these entries. And that the agency- Isn't that something where we should be giving quite a bit of discretion in terms of reviewing what customs thinks is necessary to properly appraise or determine the facts relating to these entries? I think that customs has some form of discretion to figure out what is necessary for them to do, but that when their internal processes take this long and stuff like that, that they're on the clock with the liquidation statute and that that's the clock that marks it. I have. I mean, I'm not without sympathy that they filled in every single gap for every single day, but we don't do that here. And you can't review it. I mean, if it's a line drawing, you say they took too long, so if they should have taken 30 days as opposed to 60 days, one, I don't know how we at the appellate level could make that determination. But the burden is on you to prove that, and I just don't know how you would expect us to reach the conclusion you want to reach based on the record before us. Yes. Well, I understand, Your Honors, and we respectfully disagree on our papers, but I think if, unless you guys, Your Honors, have any other questions on this issue, I will move on to the next issue. Okay. All right. The next issue is whether or not the appellant's entries during the time period were sales for export to the United States. The value statute's preferred method of evaluation is transaction value. Transaction value is the price actually paid or payable in the sale of a merchandise for export to the United States. This not only requires that there be a bona fide sale of merchandise, but that there be a sale for export to the country. A sale for exportation requires that the goods must move from one country to another as a result of a contract of sale. At the time of sale, where is the subject merchandise stored? It was stored in Canada. I think it's on the record. A sale for exportation requires that the parties to the contract for sale have a meeting of the minds regarding the sale for exportation. Not all foreign goods will enter the United States pursuant to a sale for exportation, and this is something the value code anticipates in providing for alternative methods. What the trade court in customs did in this case was to rewrite Midwest contracts inferring an international sale for export when none existed between Midwest and its customers. And why is that so? Because there's a lot of things to look at in response to that. The first thing I want to point out is the terms of the sale were FOB, Buffalo, New York. Yeah, and I didn't really – I mean, the government responds, and I don't see where they're wrong. They raised an interesting point that if we were to agree with you that the shipping terms are relevant to our statutory analysis, couldn't an importer circumvent the statute entirely all the time by selecting a particular method of shipment? It seems pretty extreme to me. I think that the FOB term is just an indication here that it was a domestic term, that it's one of the few indications that the sale was not for export to the United States. You could have a shipping term that includes a domestic FOB then, and it still would be obvious by some of the other factors that there is a sale for export. Mike, in this case, the customers – Why does that dislodge the conclusion that there's a sale for export? I mean, the goods were in Canada. They can come from China, and they're purchased in Canada, and they come over the border, and they get delivered to the customers. And they come over the border after they've already been paid for. Well, the orders for the goods were placed in the United States. Midwest CVK was a United States company, and it employed a United States sales force. And employees in the U.S. went around to different customers, and they gathered the orders in the United States. But the product, it was for products that were in Canada that had been imported from China, right? Yes. Okay. Yes. So don't you think that would have an impact on how we do all of these assessments? If somebody comes from China or from Canada or from Mexico and individually makes a sale in the U.S., it's not an import? It could be a sale for import if the meeting of the minds was for a sale to import the stuff, the merchandise into the country. Well, if you're an American consumer and you're dealing with a company and you're buying goods that are in another country that are going to be shipped for that country to you, isn't the understanding that goods are going to be imported that you're buying? If the consumer is aware that the goods are imported. In this case, as far as Midwest customers understood, is that they were just buying the goods from the Port of Buffalo under the shipping term. So that's the test? It's what the customer in the U.S. understands? So that's the dispositive test for whether or not? Yes, because for a sale for export, there needs to be – Do you have legal support for that being the test? What legal support do you have that that is the dispositive test? The first thing I want to point is that the text of the statute says a sale for import into the United States, and as I was mentioning previously, the sale must be a meeting of the minds between the two parties. And the second, I would point to the Oversphere case. Who are the two parties here? In this case? Customer and Midwest. Customer and Midwest, yes. And there's no dispute the purchase was a product. While the products were in Canada, to be imported to the customer in the U.S., right? Nobody's disputing that. No, we're not disputing that, no. Okay, so I'm not clear what meeting of the minds, the failure of the meeting of the minds would dislodge that conclusion. I mean, do we adjudicate these cases by going to every customer and saying, did you know these came from China or did you think you were buying them from Baltimore? I mean, I don't understand what your intent is and how it would work. Well, I mean, the Oversphere report put forward that there's a number of factors to consider in that, and the FOB term was one of them, and that the court took into consideration a number of things that it said were domestic factors. Yeah, the problem with Oversphere is that the CIT did, I think, a good analysis, talking about that being an old case that was adjudicated under a different statute, which has since been revised, the argument being made that the revisions dislodged whatever came out of that case. No? Is it wrong? Are they wrong? The Oversphere case was decided under the current value statute, and the case decided between deductive and transaction value. The Oversphere court took a holding from this court in the Massey case, which was decided under the previous value code. Okay. Yes, but the Oversphere court was under the current value code, and the Massey case, even though it was decided under a previous value code, the thing that the court in Oversphere took was a very similar language to the language that is in the statute now, a sale for export to the United States from the previous statute. And the court of international trade in this case basically explained why Oversphere doesn't apply, but as the court of appeals, even if Oversphere did apply, we wouldn't have to follow it, would we? No, you don't have to follow it. Do you have any binding case law that we would need to follow that would support the arguments you're making here? Binding case law from this court to follow, I would think that the issue of a sale for export to the United States has been before this court a lot, in a few other cases, but in different scenarios, mostly involving first sale. But I think, you know, based on our research and in writing these briefs, that there really hasn't been an opinion on point, I would think, about this issue. Okay. Do you want me to read that? Yes, ma'am. Thank you. Thank you. I was looking at my watch to see if I should say good afternoon or good morning, but we're right on the cusp here. I'll say good morning. May it please the court. The trial court properly determined both issues here, that there was a sale for exportation to the United States, and that the merchandise did not liquidate by operation of law. Can I ask you about the second one first? Sure. At some look at what went down, I mean, Ford Motors construction of the statute, that it can be internal stuff. What was done? I think they make an argument, and I didn't have enough documents in front of me to determine the brightness around it. Does the government establish that the stuff that was done during this interim period, the review, the audits, et cetera, et cetera, was relevant to the ultimate conclusion? Yes, Your Honor. What happened here? Just to put this a little bit in perspective, this is the magnitude of the case. This case had 562 entries, sometimes with 100 or more line items, which related to different classifications. So each of the 561 entries had a lot of stuff under that? A lot of stuff. And just to give you a little bit, I mean, this was actually in Midwest Brief. This covered millions of individual sales to U.S. customers, and they said 12,000 distinct SKUs. And at every phase here, the administrative phase, and even in this litigation, Midwest couldn't provide the information that would typically be used by CBP to determine a typical transaction value calculation. It was actually the reason that Midwest waived its second argument here, which is the challenge to the actual calculation. I'm sorry to interrupt, but what was the difference between you had the 2013 data? I'm sorry? Yes. The 2013 data. And there was some question raised about a problem being because you didn't have the 2014 data. Did you ever ask them for the 2014 data? I don't know. I'm not sure exactly what you're referencing in terms of the 2014 data. We did have the 2013 data at some point during the administrative process. But I think the thing that Midwest raised was that we had the 2013 data earlier on in the process than the merchandise was actually liquidated. So we had the 2013 data in 2014 at some point, but the 2013 data came into play more when we were at the second phase. So the first phase was what method evaluation should CBP implement in coming to an appraisement for this merchandise. Then the next step was, okay, how do we do this once we determine whether or not transaction value is the proper method of evaluation? As you're likely aware, 1401A dictates that CBP use transaction value whenever it can be calculated, and it can be calculated here. So during the process, there was a quick response audit as a result of what Midwest prompted by Midwest's letter to CBP saying we're going to do things different now, we've moved our offices, we're going to use deductive value. That prompted this quick response audit. And then from that point, CBP moved expeditiously as possible to first determine the proper method of evaluation and then to determine how to calculate that method of evaluation. Just putting aside for a second, they did have that information in 2014, but at that point they hadn't determined what the proper method of evaluation was. So they couldn't use that or any method at that point to do the actual calculations, which did come a bit later. So what went into determining the proper method of evaluation? How long did that take? That took from 2013 when the CBP was first alerted to this. And the Declaration of James Conrad steps through this pretty thoroughly. But there were facts that had to be gathered from the importer, which happened, as Midwest admits, through 2014, I believe the middle of 2014 somewhere. And then there was field work that was conducted. That happened through October of 2014. That included a visit to the facility in Canada and a review of some of the  Obtaining information, that's not something that CBP had at that point, because when they entered the merchandise, they entered it using what they identified as their deductive value calculation. So typically you would get purchase orders and invoices from the actual purchase and sale. That didn't happen here. That had to be asked for later. So they did send some of it. So what happened during the administrative process is that CBP asked for 12 specific line items, so they could basically trace it. Can you answer Judge Post's question about how long it took, though? Can you just get an answer to that question? Yes. So from 2013, they had a draft audit report completed in 2015 and a final audit report that was completed in 2016. And the determination there was that transaction value was the proper method of appraisement. There were a number of steps that happened as that took place. What is the government's view about how we are supposed to review a case such as this? Do we set up a calendar and look at the gaps, months, what was done, and then have to think about, well, was that a reasonable period to perform these tasks within that period? How are we supposed to review this? This is an abusive discretion standard. And the limitation on CBP's discretion is a narrow one, and that's all set forth in St. Paul Fire and Marine, and I believe it's also touched upon in the Ford Motor Company case. But an abusive discretion may only arise when the extension is granted following the elimination of all possible grounds for an extension. Essentially, CBP would have had actual knowledge that there was no reason to extend the liquidation, and yet they extended it anyway. It's been described by this court in prior case law as a very narrow limitation. So this is an area where CBP has significant discretion in fixing the final appraisal of merchandise as well as in extending liquidation, which is part of that. And that's in 19 U.S.C. 1500A. It says CBP is responsible for fixing the final appraisal of merchandise by ascertaining or estimating the value thereof by all reasonable means in its power. Their purpose and what they are required to do is fix the final appraisal by utilizing all the tools that they have. And in this case Congress was smart enough to have this ultimate timing, right? There is an ultimate. Four years too late to that. There is an ultimate limitation. They can't extend liquidation forever. The general rule is that you have a year to liquidate an entry or it liquidates by operation of law. But the statute also permits three one-year extensions if the information that's reasonably necessary to liquidate the merchandise or properly appraise the merchandise isn't available. And as Your Honor has pointed out, that doesn't just include information from the importer. That also includes information from other areas of CBP. And although, yes, there was a lot of I's dotted and T's crossed in making sure that the proper method of appraisement was identified, these are people that have expertise in this area and had to determine whether everything that was done by CBP was in compliance with generally accepted auditing standards. You mentioned that there's the one year and then after that it's every year. You extend it year to year? There is three. You can get additional one-year extensions. Do they have to notify the parties or do anything official if they reach the one-year, the two-year point saying we're extending it for another year? I do believe they are required by the statute to notify the parties of an extension of liquidation. I don't think there was any question in this case as to whether or not the importer was notified of the liquidation extension. But the statute doesn't require that they explain the reasons and bases for the extension in those notices? I don't believe there's any need to explain in any level of detail the reason for the extension, just that there was notification. And I actually maybe don't know, but is this pretty routine to extend it a year or two? Because I don't think I've seen a case involving this, but I don't think that means that you always get it done in one year. I would say that it's fairly typical, for my knowledge, that there might be extensions of the liquidation period. I will say in value cases that might happen more so than other cases when it comes to getting regulatory audit involved, which does get involved in cases like this where value is an issue and there are other accounting principles that have to be explored. They do, I would say, tend to take a little bit longer to make sure other parts of CBP get involved, not just the people at the port who typically just deal with some valuation issues. This type of case, I would say, would typically take a little bit longer. One thing I want to point out, based on something that was said in Midwest Brief, the value recommended by the auditors, the transaction value, was the method of appraisement that was utilized by CBP in fixing the final appraisement of the merchandise. Like I said, it wasn't done in the typical fashion where you have a purchase order and an invoice, but it would have been impossible for CBP to do that. In a normal circumstance, if transaction value is used, it would be the importer that provided entry papers identifying how to value the merchandise, and CBP would look at them and review them, not that they would be doing the calculation themselves. In this case, looking at more than a million different transactions, it wasn't even possible for Midwest to provide that during this litigation. The figure of a million transactions, is that in the CIP's opinion or some other place in the record? I believe that's in Plaintiff's Brief. I want to say it's on page 13 of Plaintiff's Brief, where they identified how large this is. I see the sentence, there were millions of FOB, Buffalo, New York, etc. Over 12,000 distinct products, hundreds of different tariff classifications. They don't actually cite anything there, but I guess you're not contesting it. I'm not contesting it, and it does make sense. This is not in the record, but just looking at the entry papers, which I have looked at, when you have 100 line items, and the line items represent a classification. If you say just one entry has 100 line items, that means this entry covers 100 different classifications. The number is, I don't contest, to answer your direct question. I do not contest that this is extremely voluminous, and it was one of the reasons that... I think this is good for you. That's the reason I asked the question, though, because I wasn't sure where it was coming from, but now I know. One thing I wanted to point out is the transaction value was used. Again, it wasn't used in a typical way. Just to go back to Your Honor's question, they did ultimately use the 2013 financial statements in order to identify transaction value. They used the information to identify the price paid or payable by Midwest to its U.S. customers, and that's how it was calculated. Unless Your Honors have any more questions on this issue, I'm going to move on to sale for export. Sorry. The trial court properly determined that the sales at issue were for exportation to the United States. This issue was addressed by the Federal Circuit, most prominently in E.C. McAfee and E.C. Ewald, which do discuss sale for exportation to the United States, and the standard that is applied is whether at the time of the transaction in question, the merchandise is clearly destined for exportation to the United States. And E.C. McAfee provides further guidance on that. But each of those cases is a little different, right? Because they all were looking at the sale of the merchandise from the foreign manufacturer to the middleman. They're not looking at the point we're looking at. Not that it makes any difference, necessarily, but they were different. Fair point, Your Honor. I mean, those are all three-tier transactions, I would say. But the determination of a sale for export has to be made individually based on each sale. What Nisha Ewald tells you and what it's most often cited for is if you have two that satisfy the statutory requirements of sale for export, you use the first. That's why that's the first sale rule. So here, there actually is a three-tier transaction. You have the sale from China to Midwest, but it goes to Canada. Isn't the sale from China irrelevant? It just had to do with whether they had to pay Canadian import taxes. It's irrelevant to this analysis. I bring it up only to say this has a three-tier transaction, but they're not arguing first sale because they can't. That was a sale for export to Canada. It was intended to go to Canada. There is only one sale that we're looking at here. So while there is a distinction a little bit in those cases they were arguing for the first sale, here they're not because they can't. But in those cases also, you look at the other sale. You have to see if they both satisfy. And if they both satisfy, you use the first sale. And that's what Nisha Ewald tells you. But it also is giving you the standard that has to be applied any time you're looking at a sale and saying, is this sale for exportation to the United States? And they're looking at, at the time of the transaction in question, was the merchandise clearly destined for exportation to the United States? And here it clearly was, as the trial court probably held. And E.C. McCarthy, which was decided earlier in time but does provide additional guidance, it's telling you this is a fact-specific inquiry. You look at it on a case-by-case basis. And we're looking at the reality of what happened, which goes to, a plaintiff is talking about a meeting of the minds. That's not necessary here. That's not part of any statute. That's not part of the case law. What the case law tells you, what E.C. McCarthy tells you, is you look at the reality of the situation here. And what happened here was the merchandise was coming from Canada based on a sale. And it came into the United States based on that sale. And transaction value is the proper method of appraisal here. Any other criteria that the plaintiff identifies or that Midwest identifies is not relevant here. Whether there's an international sale is not relevant. We're beyond our time. Thank you, Your Honor. Thank you, Your Honor. I'd like to make two quick points on rebuttal to the government. The first was that the government said that the actual liquidations that occurred in this case were under transaction value. And then they were talking about how the uplift calculation accomplished that. We don't believe that represents transaction value at all. We think that that was an arbitrary uplift. And I'd also like to point out that that uplift was calculated using the 2013 financials. And then that was also applied to later entries, the 2014 time period, and that there couldn't have been any sort of uplift relevant to those entries to be garnered from the 2013 financial statements. And then I'd like to finish up by pointing out that we think the government was talking about that this was clearly a sale for export to the U.S. And the trade court's opinion, we think, is returning to a holding in the Broster House case from the trade court that was overturned by this court, Anisha Wewa, to look at the sale that most directly caused export to the United States and applying that test to the sale for exportation question under the statute. And we submit that that standard has already been overturned and is improper to apply. Thank you, Your Honor. Thank you. The case is submitted. That concludes our proceedings this morning.